## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

RODNEY BECKWITH IV,

     Plaintiff,

vs.

Case No. 22-

Hon.

FORD MOTOR COMPANY, a
Delaware Corporation

     Defendant.

---

PITT, MCGEHEE, PALMER,
BONANNI & RIVERS P.C.
Channing E. Robinson-Holmes (P81698)
Kevin M. Carlson (P67704)
Michael L. Pitt (P24429)
Attorneys for Plaintiff
117 W. Fourth Street, Suite 200
Royal Oak, Michigan 48067
(248) 398-9800
(248) 268-7996 (fax)
kcarlson@pittlawpc.com
mpitt@pittlawpc.com
crobinson@pittlawpc.com

---

## COMPLAINT AND JURY DEMAND

Plaintiff Rodney Beckwith IV brings this action for wrongful discharge and civil rights violations under the Employee Retirement Income Security Act ("ERISA"), the Family and Medical Leave Act ("FMLA"), Michigan's Persons with Disabilities Civil Rights Act ("PDCRA"), and Michigan's Elliott-Larsen Civil

Rights Act ("ELCRA") against his former employer, Defendant Ford Motor Company, and states as follows:

## PARTIES, JURISDICTION, AND VENUE

1.     Plaintiff Rodney Beckwith IV is a 53-year-old male and resident of Livingston County, Michigan.

2.     Defendant Ford Motor Company is a Delaware Corporation that is headquartered and established in Wayne County, Michigan.

3.     All of the events in controversy occurred in Wayne County, Michigan.

4.     This Court has subject matter jurisdiction over this matter because Plaintiff's ERISA and FMLA claims arise under federal law.

5.     This Court should exercise its supplemental jurisdiction over Plaintiff's state law claims because those claims arise out of the same set of operative facts as Plaintiff's federal claim, such that all claims form part of the same case and controversy.

6.     Venue is established in this District Court because the parties reside within the Eastern District of Michigan and the events giving rise to the lawsuit occurred in the Eastern District of Michigan.

## STATEMENT OF FACTS

7.     Plaintiff Rodney Beckwith IV ("Beckwith" or "Plaintiff") began working for Defendant Ford Motor Company ("Ford" or "Defendant") as a Product Engineer Designer on or about May 16, 1994.

8.     Beckwith is part of a family of Ford employees. His father, as well as his uncle, worked in the Engineering Design Department at Ford for over thirty years, until their respective retirements.

9.     Throughout the course of Beckwith's employment, he demonstrated strong performance, receiving positive performance reviews, including "Achiever" ratings in his performance reviews from 2009 to 2021, as well as annual pay raises and bonuses in recognition of his strong performance.

10.     Beckwith is an accomplished Engineering Designer with a proven knowledge and valuable skill set in the automotive industry the area of computer-aided design ("CAD design").

11.     Beckwith's acumen for vehicle engineering design is demonstrable: he has received numerous recognitions over the years for his excellent performance he designed the rear stabilizer for the 2005 Ford Escape.

12.     Beckwith's supervisors regularly praised his performance, experience, flexibility, skill set, and skill development in his performance reviews, stating:

   a. In 2009: "Expert understanding of suspension and how they function, has been working in SAT for many years" and "[k]ey member of

suspension team that designed & packaged integral link rear suspension for CD4."

b. In 2010: "Works well with D&R engineering & displays in depth knowledge to deliver design support."

c. In 2011: "Delivers assignments with a high level of commodity system and toolset competency" and "[h]as shown high degree of ability to take on, learn, and implement new tools & process on work related assignments."

d. In 2012: "Is proficient is [sic] CAD tools utilized on suspension systems CAD related product work."

e. In 2013: "Mr. Beckwith is: * Fluent in complex KBE tools use – MMT, MWT, SAT; uses tools to complete dynamic clearance checks of complex system. * Provides supervisors with status for critical issues. * Strives for completion of quality work – ensuring FECDS requirements and CAD department processes are met. * Maintains excellent relationship with his suppliers, engineers, management and peers."

f. In 2014: "Mr. Beckwith uses KBE toolset to complete dynamic clearance checks of the suspension subsystem. He provides supervisors with status for critical issues and maintains excellent relationships with his suppliers, engineers, management and peers."

g. In 2015: "Rodney is a welcomed addition to our section. He communicates well and is concerned with delivering his assignments with quality. Comments by co-workers validate Rodney's experience teamwork. He continues to make sound decisions based on fact and pushes to deliver his tasks on time."

h. In 2016: "Rodney is a very hard working employee. He is very dedicated to his job. He has exceptional job knowledge. Rodney's suspension commodity experience has allowed our team to easily deliver our programs on time through the Publish Point reviews and milestone deliverables with quality. He takes on additional responsibilities to help the team move forward. Rodney's focus on quality and productivity is apparent in his work results."

i. In 2017: "Rodney contributes to team efforts. He seeks assistance when confronted with challenges. Rodney reviews work with team members and customer and makes adjustments as needed. He seeks views that are different than his own. Rodney adjust his work priorities to align with the teams changing priorities."

j. In 2018: "Rodney is currently preparing for CX727 FDJ. He has taken on new commodities this year (cooling, climate and powertrain mounts) and has embraced the new components. Rodney is always willing to pitch in and help the team with any assignment. He is continuously adjusting his work priorities to align with the team's ever changing priorities. Rodney is a valued asset to the team and a pleasure to work with."

k. In 2019: "Rodney is always willing to pitch in and help the team with any assignment. He is continuously adjusting his work priorities to align with the team's ever-changing priorities. Rodney has completed 4 FDJs this year (CX727, S550 Feature Car, U725, P758). He is currently preparing for the CX727GT and CX727C releases.

l. In 2020: "Mr. Beckwith is responsible for suspension systems. Excellent knowledge of CAD tools and processes to manage his systems. Managed suspension systems and program deliverables very well. Team player, very flexible and positive attitude and helped team to successfully achieve program deliverables."

### April 2, 2021: Beckwith Suffers a Stroke and Takes a Medical Leave from Ford

13. On April 2, 2021, Beckwith suffered a stroke.

14. Because of his stroke, Beckwith took a medical leave from work through July 15, 2021.

15. As a result of Beckwith's stroke, he suffered apraxia, aphasia and occasional numbness on the right side of his body.

16.     Aphasia affects a person's ability to express speech.

17.     Beckwith treated with a speech therapist until February of 2022 to treat his aphasia.

18.     Beckwith likewise treated with a physical therapist until August of 2021 and an occupational therapist through 2021.

19.     Throughout the course of his medical leave, Beckwith and his wife, Michelle Beckwith, were in frequent communication with his supervisor, Sukhdev Badwal ("Badwal").

20.     Beckwith and his wife informed Badwal that Beckwith had suffered a stroke that affected his speech and fine motor skills, requiring therapy.

21.     Beckwith and his wife likewise expressed concerns to Badwal about Beckwith retaining his job while on leave, but Badwal reassured them not to worry, further stating "Rodney [Beckwith] is part of the A-TEAM."

### July 16, 2021: Beckwith Returns to Work with Visible Effects from Stroke

22.     On July 16, 2021, Beckwith began a gradual return to work with a reduced hourly workday, pursuant to his physician's restrictions:

      a. From July 16, 2021 to August 1, 2021, Beckwith worked four hours per workday.

      b. From August 2, 2021 to August 15, 2021, Beckwith worked six hours per workday.

23.     On August 16, 2021, Beckwith returned to work without restrictions.

24.    Upon his return to work, Beckwith was visibly experiencing aphasia, which was evident from his speech.

25.    During his biweekly one-on-one sessions with Badwal, Badwal repeatedly asked Beckwith about his health, recuperation, and struggles with aphasia.

26.    Notwithstanding his apraxia and aphasia, Beckwith was fully capable of performing all essential functions of his position, and Beckwith's apraxia and aphasia did not impact his ability to perform his job in the highly proficient manner he was accustomed to.

27.    Despite Beckwith's continued excellent job performance, another co-worker, Joe Platz ("Platz"), was assigned to work on rear suspension with Beckwith following his stroke; prior to his stroke, Beckwith performed rear suspension work alone.

28.    At the end of 2021, Badwal conducted Beckwith's annual performance review. Badwal rated Beckwith as an "Achiever," and included comments nearly identical to Beckwith's 2020 performance review, but added, "You've been assessed as an Achiever in 2021. In order to maintain that rating in 2022, you have to improve *speed of execution* on system integration responsibility." (emphasis added).

29.    Badwal's reference to Beckwith's "speed of execution" was a veiled reference to Beckwith's ongoing stroke symptoms, and the comments in Beckwith's

review reflected a bias and assumption that his medical disability would result in lower performance ratings in the future.

30.    At no time prior to his 2021 performance review did Badwal indicate to Beckwith that he had any performance issues or complaints about his "speed" of performance.

### April 30, 2022: Beckwith Suffers Discriminatory Termination

31.    On April 30, 2022, Beckwith met with Janak Chitalia (Badwal's supervisor), via a remote WebEx conference, and was informed that Ford was terminating his employment, effective April 30, 2022, pursuant to a formal company program known as the Salaried Involuntary Reduction Process ("SIRP").

32.    At the time of his termination, Beckwith had never been advised of any deficiencies in his performance or skills or offered any trainings to expand his skill set.

### a) The Salaried Involuntary Reduction Process ("SIRP")

33.    The SIRP is a separation program under which Ford managers are purportedly required to select employees for termination based on one or more of the following three criteria: SIRP criteria: (1) performance; (2) skill level and breadth of skills; and (3) the correlation between skill level and breadth and necessary for the company to achieve objectives, which Ford also calls "skills needed for the future," or "future skills."

34.    At the time of termination, Beckwith was classified as a salaried employee at the GSR7 level and was thus eligible to be separated under the SIRP.

35.    The three SIRP criteria are part of a uniform, company-wide program which directs and guides decision-making for salaried employee terminations, including Beckwith's termination, and requires all decision-makers to use common decision-making tools and the same three criteria for selecting employees for separation.

36.    Each of the SIRP criteria, individually or combined together, direct decision-makers to discriminate on the basis of age. The "skills for the future" criterion, for example, requires decision-makers to engage in biased decision-making about what an employee's future contribution to the company will be, to the inherent disadvantage of older personnel.

37.    The SIRP criteria also are not based on objective or quantitative criteria, but are instead dependent on the highly subjective and discretionary impressions of decision makers, and the implementation of the SIRP is therefore prone to discriminatory bias.

38.    Furthermore, the performance criteria is infused with age discrimination because performance is a subjective variable, and Ford utilizes a forced-ranking process known as the 25-panel process to formulate performance

ratings, despite the fact that the 25-panel is empirically proven to be an age-biased method for rating employee performance.

39.    By requiring decision-makers to consider "skills for the future," the SIRP directs decision-makers to base separation decisions on age-biased factors, including assumptions that younger employees will be more likely to have the skills needed for Ford's future objectives, and assumptions that older employees will be less likely to adapt their skills to future needs, and that older employees will be slower to learn new skills, programs and processes.

40.    Furthermore, if these SIRP criteria had been applied faithfully, rather than as a vehicle for age discrimination and interference with pension benefits, then Beckwith would not have been terminated because he was a long-term employee with an excellent performance record, there was no factual basis for selecting him for termination based on his prior performance or skill-set, and, other than age-biased decision-making, there is no basis for concluding that he lacked "skills for the future" in comparison with his substantially younger employees, who were retained.

41.    Ford has engaged in a pattern and practice of age discrimination through the design and implementation of the SIRP program, and prior group terminations under the SIRP program have empirically been proven, through

statistical evidence and otherwise, to discriminate against older employees by disproportionally selecting older employees for termination because of their age.

42.    For example, the 2019 SIRP terminations resulted in statistically significant disparities based on age, and Ford's highest-level executives and members of Ford's Board of Directors specifically requested that the termination program be used to "identify and elevate junior talent in the organization" and to pull up younger personnel from the company's "pipeline" to replace the older employees who were selected for termination in the SIRP.

43.    In early 2022, prior to Beckwith's termination under the SIRP, Ford's CEO Jim Farley ("Farley") stated publicly that the Company would be making organizational changes and employee separations.

44.    In these statements, Farley used explicitly ageist as well as implicitly "coded" terminology which reveals an intention on the part of Ford Motor Company to select older employees for separation based on their age.

45.    For example, Farley expressly compared the state of the Company today to the state of the Company when his grandfather worked for Ford, saying, "My grandfather worked at the Rouge plant and those jobs are going to change."

46.    Farley also described needed organizational changes as requiring "totally different talent" because "We don't have that talent at Ford."

47.     Farley's comments reflect Ford's systemic bias against older incumbent employees based on the ageist assumptions that they cannot develop new skills, cannot adapt their demonstrated skill sets to new requirements, and would be too slow in learning, developing or adapting skills to the needs of the Company.

**b) Beckwith was Targeted for Termination Based on His Actual or Perceived Disability**

48.     At the time of Beckwith's termination, he was visibly struggling with apraxia and aphasia, affecting the major life activity of speech, caused by his 2021 stroke.

49.     Beckwith was targeted for termination because of his actual and/or perceived disability.

50.     During the SIRP reorganization, a non-disabled employee assumed Beckwith's responsibilities, effectively replacing him.

51.     As a result of his termination from employment, Beckwith has suffered and will continue to suffer economic and non-economic damages including, but not limited to lost wages and benefits, lost pension benefits, lost retirement health care benefits, as well as mental anguish, embarrassment, and pain and suffering.

## COUNT I
### VIOLATION OF ERISA §510

52.     Beckwith incorporates by reference the allegations set forth above as if stated in full herein.

53.     Section 510 of ERISA, 29 U.S.C. §1140, makes it unlawful "[f]or any person to discharge, fine, suspend, expel, discipline or discriminate a participant or beneficiary... for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, [or] this title." 29 U.S.C. §1140.

54.     The prohibitions of § 510 are aimed primarily at preventing employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights.

55.     By its terms, § 510 protects plan participants from termination motivated by an employer's desire to prevent a pension from vesting. However, the protections of § 510 are not limited to vested pension rights. The Sixth Circuit has clarified that § 510 prohibits interference with rights to which an employee 'may become entitled' under 'an employee benefit plan' and does not limit its application to benefits that will become vested.

56.     Unlawful interference under Section 510 includes terminating an employee in order to interfere with the employee's ability to receive future benefits under an ERISA plan. ERISA Section 510 is designed to protect the employment relationship which gives rise to an individual's pension rights.

57.     In this case, Ford intentionally terminated Plaintiff's employment pursuant to the SIRP for the specific purpose of interfering with his ability to receive

identifiable ERISA Plan benefits, specifically (1) "55 and 10" early retirement benefits under the GRP; and (2) "30 and Out" supplemental benefits" under the GRP.

58.    In selecting employees for termination under the SIRP, Ford utilized a decision-making structure, computer program, database, and algorithm designed and implemented to target employees for termination based on proximity to age or service milestones.

59.    There is evidence that Ford was concerned about high GRP legacy costs attributable to older employees, such as Plaintiff, who was close to attaining full GRP benefits in the form of "55 and 10" or 30 year retirement benefits.

60.    Both internally and publicly, Ford as expressed its concerns about increasing pension liabilities in the form of pension benefits that would be payable to aging employees, including Plaintiff, who were approaching but still short of their "55 and 10" early retirement benefits and "30 and out" supplemental pension benefits.

61.    The highest members of Ford Senior management have expressed the intention and gave directives to terminate employees in the SIRP process if they were hired before January 1, 2004.

62.    Ford's intention to interfere with GRP benefits was a determining factor in its decision to terminate Plaintiff's employment in the SIRP.

63.    Plaintiff was approaching vesting in full GRP benefits, and this proximity to vesting provides an inference of intentional, prohibited interference in violation of ERISA Section 510.

64.    Plaintiff has standing to bring this Section 510 claim against Ford because he is an employee or former employee of Ford who is or may become eligible to receive a benefit from the GRP, an employee benefit plan, and is therefore a "participant" in the GRP.

65.    As a result of Ford's violation of Section 510 of ERISA, 29 U.S.C. §1140, Plaintiff has suffered and will continue to suffer damages in the form of lost salary and benefits, including GRP benefits.

66.    Accordingly, to redress the violations of ERISA §510 alleged in this action, Plaintiff requests the following relief from this Court:

a.    A declaration that the GRP is an ERISA plan;

b.    A declaration that Ford violated Plaintiff's rights under §510 of ERISA when it terminated Plaintiff's employment in order to interfere with his ability to receive future benefits under the GRP;

c.    An equitable order of reinstatement to his prior position or to comparable positions of employment with Ford, or an equitable order of front pay in lieu of reinstatement;

d. An order of equitable relief awarding GRP benefits, or other monetary compensation, in order to make Plaintiff whole;

e. An order of any other equitable and/or legal relief the court deems necessary to enforce Plaintiff's rights under ERISA;

f. An award of attorneys' fees and costs.

## COUNT II
### VIOLATION OF THE FAMILY MEDICAL LEAVE ACT
### 29 U.S.C. § 2601 ET SEQ.

67.     Plaintiff incorporates the foregoing paragraphs of this Complaint as though set forth fully herein.

68.     At all times relevant to this action, Defendant Ford was an employer within the meaning of the FMLA because Defendant employed 50 or more employees.

69.     At all times relevant to this action, Plaintiff was an eligible employee under the FMLA because he worked for at least 12 months for Defendant and in excess of 1,250 hours during the twelve months immediately preceding the date on which he took approved FMLA leave.

70.     Under the FMLA, Beckwith was entitled to up to 12 weeks of leave because of his own serious health condition.

71.     Plaintiff took approved FMLA leave in 2021 because of his stroke.

72.     Defendant's Human Resources department approved Beckwith's request for leave because of his serious health condition.

73.     The Family Medical Leave Act, 29 U.S.C. §2615, creates a cause of action for persons denied protection of the Act because the employer either (1) interfered with, restrained, or denied the exercise of or the attempt to exercise, any right provided by the FMLA; or (2) discharged or in any other manner discriminated against any individual for opposing any practice made unlawful under the FMLA.

74.     Ford granted Plaintiff medical leave under the FMLA.

75.     Ford discriminated and retaliated against Beckwith for his use of FMLA leave by terminating his employment, and but-for Beckwith's use of FMLA leave, Ford would not have terminated his employment.

76.     As a result of Ford's actions, Beckwith was damaged by Defendant in the nature of lost wages, salary, employment benefits and other compensation, actual monetary losses and expenses incurred.

### COUNT III
### VIOLATION OF ELCRA
### AGE DISCRIMINATION- WRONGFUL TERMINATION

77.     Beckwith incorporates by reference all the allegations contained above, as though stated in full herein.

78.     At all times relevant to this action, Defendant Ford was an employer within the meaning of the ELCRA.  MCL §37.2201(a).

79.     Under the ELCRA, Ford is prohibited from limiting, segregating, or classifying an employee in a way that deprives or tends to deprive the employee of an employment opportunity because of the individual's age, or to otherwise discriminate against an individual with respect to employment, compensation or a term, condition or privilege of employment, because of the individual's age.

80.     In violation of the statutory duties set forth in the ELCRA, Ford designed and implemented the SIRP for the purpose of targeting for termination older employees, including Beckwith, so that it could promote younger employees into positions held by older and more senior personnel.

81.     Beckwith was selected for termination as part of the SIRP because of age, as demonstrated in part by the fact that Ford retained significantly younger employees in positions that Beckwith was qualified to perform, and Ford treated younger employees more favorably than Beckwith in the process of deciding which employees would be selected for separation.

82.     As a direct result of these unlawful employment practices, Beckwith has and will continue to experience economic losses in salary, incentive compensation and bonuses, fringe benefits, promotional opportunities and a loss of earning capacity caused by the stigma of being fired from a senior-level position with Ford.

83.     As a direct result of these unlawful employment practices, Beckwith has and will continue to experience non-economic losses including a loss of reputation, humiliation, embarrassment, mental anguish and emotional distress.

Accordingly, Beckwith requests the following remedies from the court:

## COUNT IV
### VIOLATION OF PDCRA
### DISABILITY DISCRIMINATION

84.     Beckwith incorporates by reference the allegations set forth above as if stated in full herein.

85.     At all relevant times, Beckwith was an employee and Defendant was an employer within the meaning of Michigan's Persons with Disabilities Civil Rights Act, M.C.L. §37.1101, *et seq* (the PDCRA).

86.     The PDCRA makes it unlawful for an employer to discriminate against a qualified individual because the individual has a disability, a record of a disability, or because the employer regards the individual as disabled.

87.     At all times relevant to this action, Beckwith was a qualified individual with a disability pursuant to the PDCRA who, with or without accommodation, could perform the essential functions of his position.

88.     Beckwith was an individual with a disability within the meaning of the PDCRA, in that he had a physical impairment that substantially limited one or more of his major life activities, who with or without accommodation could perform the

essential functions of his job with Defendant and/or Beckwith had a record of such a disability and/or was regarded by Defendant as having such a disability.

89.    Notwithstanding said duties as set forth above, Defendant discriminated against Beckwith because of his disability and/or because it regarded Beckwith as disabled and/or because Beckwith had a history of a disability when it terminated his employment and designated him as ineligible for re-hire.

Accordingly, Beckwith requests the following relief:

a.    The court should order him reinstated to his prior position, or award front pay in lieu of reinstatement.

b.    The court should award Beckwith compensation for his economic and non-economic losses.

c.    The court should award Beckwith liquidated damages under the FMLA.

d.    The court should award Beckwith actual attorney fees and litigation costs as provided for in the PDCRA.

e.    The court should award Beckwith such other relief as the court determines to be fair and just.

Respectfully submitted,

Pitt, McGehee, Palmer,
Bonanni & Rivers PC

By: */s/ Channing E. Robinson-Holmes*
Channing E. Robinson-Holmes (P81698)
Kevin M. Carlson (P67704)
Michael L. Pitt (P24429)
Attorneys for Plaintiffs
117 West Fourth Street, Suite 200
Royal Oak, Michigan 48067
(248) 398-9800 (phone)
(248) 268-7996 (fax)
kcarlson@pittlawpc.com
mpitt@pittlawpc.com
crobinson@pittlawpc.com

Date:  November 2, 2022

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

RODNEY BECKWITH IV,

     Plaintiff,

vs.

FORD MOTOR COMPANY, a
Delaware Corporation

     Defendant.

Case No. 22-

Hon.

---

Pitt, McGehee, Palmer Bonanni &
Rivers P.C.
Channing E. Robinson-Holmes (P81698)
Kevin M. Carlson (P67704)
Michael L. Pitt (P24429)
Attorneys for Plaintiff
117 W. Fourth Street, Suite 200
Royal Oak, Michigan 48067
(248) 398-9800
(248) 268-7996 (fax)
kcarlson@pittlawpc.com
mpitt@pittlawpc.com
crobinson@pittlawpc.com

---

## DEMAND FOR JURY TRIAL

    Plaintiff demands a trial by jury as to all issues raised in this action.

                Respectfully submitted,

                Pitt, McGehee, Palmer,
                Bonanni & Rivers PC

            By: /s/ Channing E. Robinson-Holmes
                Channing E. Robinson-Holmes (P81698)
                Kevin M. Carlson (P67704)

Michael L. Pitt (P24429)
Attorneys for Plaintiffs
117 West Fourth Street, Suite 200
Royal Oak, Michigan 48067
(248) 398-9800 (phone)
(248) 268-7996 (fax)
kcarlson@pittlawpc.com
mpitt@pittlawpc.com
crobinson@pittlawpc.com

Dated: November 2, 2022

JS 44   (Rev. 11/15)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a)  PLAINTIFFS | DEFENDANTS |
|---|---|
| RODNEY BECKWITH IV | FORD MOTOR COMPANY |

**(b)**  County of Residence of First Listed Plaintiff   Livingston
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Wayne
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)**  Attorneys *(Firm Name, Address, and Telephone Number)*
Channing Robinson-Holmes (P81698)
Pitt McGehee Palmer Bonanni & Rivers PC
117 W. 4th Street, Ste. 200
Royal Oak, MI 48067 - (248) 398-9800

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1   U.S. Government Plaintiff
- ☒ 3   Federal Question *(U.S. Government Not a Party)*
- ☐ 2   U.S. Government Defendant
- ☐ 4   Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 840 Trademark | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | **LABOR** | **SOCIAL SECURITY** | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | Act | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | Relations | ☐ 864 SSID Title XVI | Exchange |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 751 Family and Medical | | ☐ 891 Agricultural Acts |
| | ☐ 362 Personal Injury - | Product Liability | Leave Act | | ☐ 893 Environmental Matters |
| | Medical Malpractice | | ☐ 790 Other Labor Litigation | | ☐ 895 Freedom of Information |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☒ 791 Employee Retirement | **FEDERAL TAX SUITS** | Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | Income Security Act | ☐ 870 Taxes (U.S. Plaintiff | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | or Defendant) | ☐ 899 Administrative Procedure |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | Act/Review or Appeal of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | 26 USC 7609 | Agency Decision |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | | State Statutes |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| | Other | ☐ 550 Civil Rights | Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from Another District *(specify)*
- ☐ 6  Multidistrict Litigation

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:   29 U.S.C. § 1140
Brief description of cause:   FMLA, PDCRA, ERISA violations

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

**VIII. RELATED CASE(S) IF ANY**   *(See instructions):*
JUDGE _____   DOCKET NUMBER _____

DATE   November 2, 2022
SIGNATURE OF ATTORNEY OF RECORD   s/ Channing Robinson-Holmes

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____