# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

RODNEY BECKWITH IV,

      Plaintiff,

vs.

FORD MOTOR COMPANY, a
Delaware Corporation,

      Defendant.

Case No. 22-cv-12641

Hon. F. Kay Behm

Mag. Judge Elizabeth A. Stafford

| | |
|---|---|
| PITT, MCGEHEE, PALMER, BONANNI & RIVERS P.C. | Katherine V.A. Smith (247866) |
| Channing E. Robinson-Holmes (P81698) | Jesenka Mrdjenovic (P82587) |
| Kevin M. Carlson (P67704) | Gibson Dunn & Crutcher LLP |
| Michael L. Pitt (P24429) | Attorneys for Defendant |
| Attorneys for Plaintiff | 333 South Grand Avenue |
| 117 W. Fourth Street, Suite 200 | Los Angeles, CA 90071 |
| Royal Oak, Michigan 48067 | Telephone: 213.229.7000 |
| (248) 398-9800 | Facsimile: 213.229.7520 |
| (248) 268-7996 (fax) | KSmith@gibsondunn.com |
| kcarlson@pittlawpc.com | JMrdjenovic@gibsondunn.com |
| mpitt@pittlawpc.com | |
| crobinson@pittlawpc.com | |

## PLAINTIFF'S 2nd AMENDED COMPLAINT AND JURY DEMAND

Plaintiff Rodney Beckwith IV brings this action for wrongful discharge and civil rights violations under the Employee Retirement Income Security Act ("ERISA"), the Family and Medical Leave Act ("FMLA"), the Americans with Disabilities Act ("ADA"), Michigan's Persons with Disabilities Civil Rights Act ("PDCRA"), and Michigan's Elliott-Larsen Civil Rights Act ("ELCRA") against his

former employer, Defendant Ford Motor Company, and states as follows:

## PARTIES, JURISDICTION, AND VENUE

1.     Plaintiff Rodney Beckwith IV is a 53-year-old male and resident of Livingston County, Michigan.

2.     Defendant Ford Motor Company is a Delaware Corporation that is headquartered and established in Wayne County, Michigan.

3.     All of the events in controversy occurred in Wayne County, Michigan.

4.     This Court has subject matter jurisdiction over this matter because Plaintiff's ERISA, FMLA, and ADA claims arise under federal law.

5.     This Court should exercise its supplemental jurisdiction over Plaintiff's state law claims because those claims arise out of the same set of operative facts as Plaintiff's federal claim, such that all claims form part of the same case and controversy.

6.     Venue is established in this District Court because the parties reside within the Eastern District of Michigan and the events giving rise to the lawsuit occurred in the Eastern District of Michigan.

## STATEMENT OF FACTS

7.     Plaintiff Rodney Beckwith IV ("Beckwith" or "Plaintiff") began working for Defendant Ford Motor Company ("Ford" or "Defendant") as a Product Engineer Designer on or about May 16, 1994.

8.     Beckwith is part of a family of Ford employees. His father, as well as his uncle, worked in the Engineering Design Department at Ford for over thirty years, until their respective retirements.

9.     Throughout the course of Beckwith's employment, he demonstrated strong performance, receiving positive performance reviews, including "Achiever" ratings in his performance reviews from 2009 to 2021, as well as annual pay raises and bonuses in recognition of his strong performance.

10.    Beckwith is an accomplished Engineering Designer with a proven knowledge and valuable skill set in the automotive industry the area of computer-aided design ("CAD design").

11.    Beckwith's acumen for vehicle engineering design is demonstrable. For example, he has received numerous recognitions over the years for his excellent performance, and he designed the rear stabilizer for the 2005 Ford Escape.

12.    Beckwith's supervisors regularly praised his performance, experience, flexibility, skill set, and skill development in his performance reviews, stating:

   a. In 2009: "Expert understanding of suspension and how they function, has been working in SAT for many years" and "[k]ey member of suspension team that designed & packaged integral link rear suspension for CD4."

   b. In 2010: "Works well with D&R engineering & displays in depth knowledge to deliver design support."

   c. In 2011: "Delivers assignments with a high level of commodity system and toolset competency" and "[h]as shown high degree of ability to take

on, learn, and implement new tools & process on work related assignments."

d. In 2012: "Is proficient is [sic] CAD tools utilized on suspension systems CAD related product work."

e. In 2013: "Mr. Beckwith is: * Fluent in complex KBE tools use – MMT, MWT, SAT; uses tools to complete dynamic clearance checks of complex system. * Provides supervisors with status for critical issues. * Strives for completion of quality work – ensuring FECDS requirements and CAD department processes are met. * Maintains excellent relationship with his suppliers, engineers, management and peers."

f. In 2014: "Mr. Beckwith uses KBE toolset to complete dynamic clearance checks of the suspension subsystem. He provides supervisors with status for critical issues and maintains excellent relationships with his suppliers, engineers, management and peers."

g. In 2015: "Rodney is a welcomed addition to our section. He communicates well and is concerned with delivering his assignments with quality. Comments by co-workers validate Rodney's experience teamwork. He continues to make sound decisions based on fact and pushes to deliver his tasks on time."

h. In 2016: "Rodney is a very hard working employee. He is very dedicated to his job. He has exceptional job knowledge. Rodney's suspension commodity experience has allowed our team to easily deliver our programs on time through the Publish Point reviews and milestone deliverables with quality. He takes on additional responsibilities to help the team move forward. Rodney's focus on quality and productivity is apparent in his work results."

i. In 2017: "Rodney contributes to team efforts. He seeks assistance when confronted with challenges. Rodney reviews work with team members and customer and makes adjustments as needed. He seeks views that are different than his own. Rodney adjust his work priorities to align with the teams changing priorities."

j.  In 2018: "Rodney is currently preparing for CX727 FDJ. He has taken on new commodities this year (cooling, climate and powertrain mounts) and has embraced the new components. Rodney is always willing to pitch in and help the team with any assignment. He is continuously adjusting his work priorities to align with the team's ever changing priorities. Rodney is a valued asset to the team and a pleasure to work with."

k.  In 2019: "Rodney is always willing to pitch in and help the team with any assignment. He is continuously adjusting his work priorities to align with the team's ever-changing priorities. Rodney has completed 4 FDJs this year (CX727, S550 Feature Car, U725, P758). He is currently preparing for the CX727GT and CX727C releases.

l.  In 2020: "Mr. Beckwith is responsible for suspension systems. Excellent knowledge of CAD tools and processes to manage his systems. Managed suspension systems and program deliverables very well. Team player, very flexible and positive attitude and helped team to successfully achieve program deliverables. Opportunities: Continue work independently and help to improve speed of execution system integration responsibility. Continue help others with workload, and support teamwork initiates. Mr. Beckwith is rated as an Achiever as compare to his peers."

### April 2, 2021: Beckwith Suffers a Stroke and Takes a Medical Leave from Ford

13. On April 2, 2021, Beckwith suffered a stroke.

14. Because of his stroke, Beckwith took a medical leave from work through July 15, 2021.

15. As a result of Beckwith's stroke, he suffered apraxia, aphasia and occasional numbness on the right side of his body.

16. Aphasia affects a person's ability to express speech and has the outward appearance of slowing a person's speech.

5

17.     Apraxia is the loss of ability to execute or carry out skilled movement and gestures, despite having the physical ability and desire to perform them.

18.     Beckwith treated with a speech therapist until February of 2022 to treat his aphasia.

19.     Beckwith likewise treated with a physical therapist until August of 2021 and an occupational therapist through 2021.

20.     Throughout the course of his medical leave, Beckwith and his wife, Michelle Beckwith, were in frequent communication with his supervisor, Sukhdev Badwal ("Badwal").

21.     Beckwith and his wife informed Badwal that Beckwith had suffered a stroke that affected his speech and fine motor skills, requiring therapy.

22.     Beckwith and his wife likewise expressed concerns to Badwal about Beckwith retaining his job while on leave, but Badwal reassured them not to worry, further stating "Rodney [Beckwith] is part of the A-TEAM."

### July 16, 2021: Beckwith Returns to Work with
### Visible Effects from Stroke

23.     On July 16, 2021, Beckwith began a gradual return to work with a reduced hourly workday, pursuant to his physician's restrictions:

    a.  From July 16, 2021 to August 1, 2021, Beckwith worked four hours per workday.

    b.  From August 2, 2021 to August 15, 2021, Beckwith worked six hours per workday.

24.     On August 16, 2021, Beckwith returned to work without restrictions.

25.     Upon his return to work, Beckwith was visibly experiencing aphasia, which was evident from his speech.

26.     During his biweekly one-on-one sessions with Badwal, Badwal repeatedly asked Beckwith about his health, recuperation, and struggles with aphasia.

27.     Notwithstanding his apraxia and aphasia, Beckwith was fully capable of performing all essential functions of his position, and Beckwith's apraxia and aphasia did not impact his ability to perform his job in the highly proficient manner he was accustomed to.

28.     Despite Beckwith's continued excellent job performance, another co-worker, Joe Platz ("Platz"), was assigned to work on rear suspension with Beckwith following his stroke; prior to his stroke, Beckwith performed rear suspension work alone.

29.     At the end of 2021, Badwal conducted Beckwith's annual performance review. Badwal rated Beckwith as an "Achiever," and included comments nearly identical to Beckwith's 2020 performance review, but added, "You've been assessed as an Achiever in 2021. *In order to maintain that rating in 2022, you have to improve speed of execution* on system integration responsibility." (emphasis added).

30.     In this context, Badwal's reference to Beckwith's "speed of execution" was based on Beckwith's ongoing stroke symptoms, including his aphasia and apraxia, and the comments in Beckwith's review reflected a bias and assumption that his actual, record of, or perceived disability would impair his ability to improve speed of execution and result in lower performance ratings in the future.

31.     At no time prior to his 2021 performance review did Badwal indicate to Beckwith that he had any performance issues or complaints about his "speed" of performance. In fact, in Beckwith's 2020 performance, review, Beckwith's supervisor identified an "opportunity" to "help to improve speed of execution..." in the context of how Beckwith could help his team improve.

32.     By contrast, Beckwith's 2021 performance review threatened that that his performance rating would be downgraded if he did not individually improve his speed of execution.

33.     It is reasonable to conclude that the comments in Beckwith's 2021 performance review, which threatened that his performance rating would be downgraded if he did not improve his speed of execution, were based on the biased assumption that, because of his actual, record of, or perceived disability, including his aphasia and apraxia, Beckwith might not be capable of improving speed of execution.

34.    It is further reasonable to conclude that Ford relied upon this assessment of Beckwith's performance, skills, and future capabilities, which were rooted in perceptions and assumptions about Beckwith's medical disability (including aphasia and apraxia) in deciding to select him for separation in the SIRP.

**April 30, 2022: Beckwith Suffers Discriminatory Termination**

35.    On April 30, 2022, Beckwith met with Janak Chitalia (Badwal's supervisor), via a remote WebEx conference, and was informed that Ford was terminating his employment, effective April 30, 2022, pursuant to a formal company program known as the Salaried Involuntary Reduction Process ("SIRP").

36.    At the time of his termination, Beckwith had never been advised of any deficiencies in his performance or skills or offered any trainings to expand his skill set.

**Beckwith was Targeted for Termination Based on His Actual or
Perceived or Record of Disability**

37.    At the time of Beckwith's termination, he was visibly struggling with apraxia and aphasia, affecting the major life activity of speech, caused by his 2021 stroke.

38.    Beckwith was targeted for termination because of his actual and/or perceived and/or record of disability.

39.    During the SIRP reorganization, a non-disabled employee assumed Beckwith's responsibilities, effectively replacing him.

**Ford was motivated to target Plaintiff and other employees for termination to prevent them from achieving ERISA-protected age and service milestones, based on the Company's desire to alleviate the financial burden of legacy costs attributable to its traditional defined benefit pension plan.**

40.     Ford's General Retirement Plan ("GRP") was formed in 1950.

41.     The GRP is a traditional, defined benefit pension plan that pays fixed monthly or lump sum retirement pension amounts to eligible Ford employees.

42.     The GRP provides a variety of pension benefits, including regular and early retirement pensions and certain supplemental pension allowances.

43.     As of December 31, 2017, the GRP had assets of $19,697,120,747; active/eligible participants totaling 16,381 people; retired or separated participants receiving benefits totaling 32,850 people; and retired or separated participants eligible to receive future benefits totaling 14,642 people.

44.     Since the early part of the 2000s, Ford has taken steps to remove from its balance sheet pension obligations that the Company, along with consultants and investors, viewed as debts weighing down its credit rating and stock price.

45.     Since the early 2000s, the Company's pension obligations to current and future retirees exceeded the assets of the GRP.  Ford has taken steps to remove from its balance sheet underfunded pension obligations that the Company, along with consultants and investors, viewed as debts weighing down its credit rating and stock price.

46.     The underfunding of the GRP has been a persistent problem continuing to the present time. This unresolved problem continues to be a source of frustration for Ford management.

47.     Although the Company has over time infused the GRP with cash to eliminate the Plan underfunding, targeting Plan participants for elimination from the Company and the GRP has been a part of the corporate strategy since late 2003.

48.     In 2003, Ford announced that beginning January 1, 2004, the GRP would be closed to new hires and rehires.

49.     According to Ford's ERISA Plan Year 2009 Form 5500, as of December 31, 2009, the GRP had assets of $18,859,715,454; active/eligible participants totaling 24,512 people or separated participants receiving benefits totaling 51,829 people; and retired or separated participants eligible to receive future benefits totaling 31,841 people.

50.     According to Forbes, Ford's global pension plans went from being $19 billion underfunded at the end of 2012 to $9.8 billion at the end of 2014.

51.     According to Ford's ERISA Plan Year 2017 Form 5500, as of December 31, 2017, the GRP had assets of $19,697,120,747; active/eligible participants totaling 16,381 people; separated participants receiving benefits totaling 32,850 people; and retired or separated participants eligible to receive future benefits totaling 14,642 people.

52.     According to Ford's ERISA Plan Year 2021 Form 5500, as of December 31, 2021, the GRP had assets of $21,860,238,492; active/eligible participants at beginning of Plan year at 13,426 and 11,760 by the end of Plan Year 2021; separated participants receiving benefits totaling 29,640 and separated participants eligible for future benefits totaling 10,500.

53.     In 2012, the Company, to further reduce its pension obligations (also known as "de-risking" its obligations), amended the GRP to provide that retiring participants would now have the option to secure a lump sum payment in lieu of the annuity which provided lifetime monthly benefits to the retiree and his surviving spouse.

54.     Ford promoted the lump sum payout option because that was a way for Ford to effectively de-risk its pension obligations by shifting the risk of an underfunded pension from the Company to the employee.

55.     As a result of this de-risking program, Ford was able to reduce its underfunded pension obligations from $19 billion in 2012 to $9.8 billion on December 31, 2014.

56.     According to Ford's 8-K Form filed with the Securities and Exchange Commission on January 22, 2020, the Company reported that, in the year 2019, the GRP was underfunded by about $6.8 billion.

57.     The Company reported that, in 2018, the GRP was underfunded by $6.3 billion.

58.     Under the amended GRP, salaried employees hired before January 1, 2004 with 30 years of Company service can retire and receive an unreduced lifetime monthly benefit with spousal survivor option, or they can elect to take a lump sum payout at retirement.

59.     The GRP includes specific ERISA Age and Service Milestones. Specifically, Ford salaried employees such as Plaintiff, hired before January 1, 2004, and who retire at age 55 years old or greater, with 10 years or more years of service, receive an unreduced monthly benefit with spousal survivor options upon retirement, or may elect to take a lump sum payout. This "55 and 10" retirement is also known as a "normal early retirement" under the GRP.

60.     Employees who at the time of retirement have 10 years or more of Company service but less than 30 years Company service or who are under age 55 with less than 30 years of service will receive a substantially reduced pension.

61.     A Retiree Health Care insurance subsidy is also available to Company employees hired before June 1, 2001, and who retire under the GRP at age 55 or greater with 10 years or more of service or at any age with 30 or more years of Ford Service.

**To achieve its objective of shedding legacy costs, Ford terminated Plaintiff's employment for the specific purpose of interfering with his attainment of ERISA-protected age and service milestones.**

62.     Beckwith was a long-term salaried employee of Ford who was hired before January 1, 2004 and was selected for separation because of his age and for the specific purpose of preventing him from reaching important milestones which would have allowed him to receive their full retirement pension benefits and would have dramatically increased Ford's financial obligations to their former employees.

63.     Ford salaried employees, such as Plaintiff, hired before January 1, 2004, were participants in Ford's General Retirement Plan ("GRP").

64.     Thus, but for the termination of his employment, Plaintiff would have attained the ERISA-protected Age and Service Milestones under the GRP, specifically:(1)  "55 and 10" normal early retirement, under which they would receive a full retirement at age 55 with ten years of service;  and (2) the "30 and Out" pension supplement, under which employees with at least 30 years of credited service who take early retirement receive an additional monthly pension payment until the age of 62 (hereinafter referred to as the "Age and Service Milestones).

65.     Ford, through the mechanisms, means, processes, and criteria used to implement its organizational restructuring action/reduction-in-force, terminated Plaintiff because of age, for the purpose of preventing him from attaining the ERISA-protected Age and Pension Milestones, namely the "30 and Out"

supplemental benefit, or the "55 and 10" early retirement benefit, or both.

66.    By terminating its salaried employees to prevent them from achieving one or both Milestones, Ford significantly reduced the employees' lifetime retirement benefits and significantly improved its balance sheet by reducing its ongoing pension, retiree healthcare and other post-employment benefit obligations.

67.    For Plaintiff, the impact of being terminated short of his ERISA-protected Age and Service Milestones is financially devasting, causing Plaintiff to lose hundreds of thousands of dollars in lifetime pension benefits, along with retiree medical benefits, because of Ford's decision to terminate him before he could reach the critical GRP pension milestones.

68.    Statistical evidence will be probative of intentional discrimination and interference in violation of ERISA Section 510 in at least two ways:  (1) the selection rate for employees hired before January 1, 2004 versus the selection rate for employees hired after 1/1/04, will be heavily weighted against employees hired before 2004, and therefore eligible for GRP, and will thus be probative of the intent to terminate employees hired before January 1, 2004; and (2) as to employees hired after January 1, 2004, who were participants in the GRP, the selection rate for employees approaching their Age and Service Milestones will be disproportionately higher, and this disparity is probative of intentional discrimination to select employees to prevent them from achieving ERISA-protected Age and Service

Milestones.

69.   A comparison of the percentage of salaried employees who were eligible for and approaching the ERISA-protected Age and Service Milestones, who were selected for separation, to the percentage of salaried employees who were not eligible for and approaching those Milestones within the Company as a whole, will prove the Company's specific intent to select employees for separation for the purpose of depriving them of ERISA-protected benefits, that is, to engage in prohibited interference with Plaintiff's attainment of the Age and Pension Milestones in violation of ERISA Section 510.

70.   A comparison of the percentage of salaried employees who were hired before January 1, 2004, and were therefore approaching ERISA-protected Age and Service Milestones, who were selected for termination, to the percentage of employees who were hired before January 1, 2004 within the Company as a whole, will be probative of the Company's specific intent to discriminate against employees who were hired before January 1, 2004 based on their ERISA-protected status under the terms of the GRP.

**Ford terminated Plaintiff because of age**

71.   Ford terminated Beckwith's employment as part of an alleged organizational restructuring action/reduction-in-force in accordance with a uniform Company program known as the Salaried Involuntary Reduction Process ("SIRP").

16

72.    The SIRP is a separation program under which Ford purportedly selects employees for termination based on one or more of the following three criteria: (1) "the employee's performance;" (2) "the employee's skill level and breadth of skills;" and (3) "the correlation between the employee's skill level and breadth of skill and the work that is necessary for the Company to perform to achieve its objectives" (Ford calls the third criteria "skills needed for the future," or "future skills.").

73.    Through that process, Ford selected Beckwith and other employees for separation because of their age and for the specific purpose of preventing them from reaching important ERISA-protected Age and Service Milestones which would have allowed them to receive their full retirement pension benefits and would have dramatically increased Ford's financial obligations to their former employees who were hired before January 1, 2004.

74.    The asserted bases for Beckwith's terminations, including Ford's alleged reliance on one or more of the three SIRP selection criteria, are merely a pretext for discrimination because Ford has relied upon the pretext of alleged restructuring to replace Beckwith with younger employees, or to hire, assign, transfer, or promote younger employees into positions for which he was better qualified to perform.

75.    In the official notification informing Plaintiff and other employees of their terminations in the SIRP, Ford stated: "You are within the decisional unit

17

identified above that management has made part of an organizational restructuring action. As part of this organizational restructuring process, you have been informed that your employment is to be terminated under the Salaried Involuntary Reduction Process ("SIRP")."

76. Ford's notification further described the "selection criteria for employees who are being terminated under SIRP in your decisional unit" as follows:

> **Selection Criteria:** Employees in the unit are selected for separation in accordance with SIRP. SIRP applies to salaried active full-time and Transitional Work Arrangement U.S. employees who are within the decisional unit. All employees within the decisional unit are evaluated for possible separation based on an assessment of one or more of the following factors: the employee's performance; the employee's skill level and breadth of skills; and the correlation between the employee's skill level and breadth of skill and the work that is necessary for the Company to perform to achieve its objectives.

77. The specific, purportedly age-neutral employment practices used by Ford to select which employees would be terminated caused significant statistical disparities based on age because:

    a. Absent explanation, one would ordinarily expect the percentage of employees over 50 selected for termination to be approximately the same as the percentage of employees over 50 within the Company as a whole.

    b. Plaintiff alleges that Ford's specific employment practices caused a significant statistical disparity based on age because the actual

number of employees over 50 who were selected will be more than 2 standard deviations from the expected outcome for employees over 50 in an age-neutral program. *See Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 309, n. 14 (1997) (quoting *Castaneda v. Partida*, 430 U.S. 482, 496-497, n. 17 (1977) ("(a)s a general rule for such large samples, if the difference between the expected value and the observed number is greater than two or three standard deviations,' then the hypothesis that teachers were hired without regard to race would be suspect.")

c. Thus, Plaintiff alleges that the employment practices used to select salaried employees for termination disproportionately affected employees aged 50 and older to such an extent that it is probative of age discrimination.

78. In this action, Plaintiff challenges the specific, purportedly age-neutral mechanisms, means, criteria, and practices by which Ford selected employees for termination in the course of implementing its organizational restructuring action/reduction-in-force, which caused significant statistical disparities based on age, including the following employment practices:

a. Designing and programming its reduction-in-force/organizational restructuring process to target older and higher pension-cost

salaried employees based on legally protected characteristics including the employee's proximity to retirement benefit milestones or the employee's age.

b. Targeting demographically disproportionate departments for separations, thus increasing the likelihood of selecting employees over the age of 50.

c. Defendant's use of the stated SIRP criteria, including: "the employee's performance; the employee's skill level and breadth of skills; and the correlation between the employee's skill level and breadth of skill and the work that is necessary for the Company to perform to achieve its objectives."

d. Defendant's practice of allowing decision makers to make putatively individualized, discretionary, and subjective choices of which jobs to eliminate and/or which employees to select for separation.

e. Placing the decision-making process in the hands of multiple decision makers without uniform criteria or standardized guidance when making those decisions.

f. Traditionally, Ford has used forced ranking performance evaluation processes and other ranking and rating methods that had been

shown to be biased against its older employees, and, upon information and belief, Ford used those same or similar forced ranking and other ranking and rating methods in the course of implementing the 2022 SIRP reduction-in-force despite knowing that they were prone to age bias.

79.    The foregoing specific employment practices are responsible for significant statistical disparities based on age and were the cause in fact of the selection of Plaintiff for separation.

80.    These specific employment practices lack structured and objective criteria, and the specific employment practices are, by design, infused with undisciplined and subjective decision making to determine how organizations would be restructured and which employees would be selected for termination.

81.    The specific employment practices challenged in this lawsuit all include subjective criteria, such as the determination of the employees' performance, skills/breadth of skills, and "correlation," which Ford commonly refers to as "future skills," or "skills for the future."

82.    These subjective criteria, either alone or in combination with objective factors, are an integral part of the specific employment practice utilized by Ford to select employees for separation, which caused disparities in the selection process based on age.

83.     The specific employment practices utilized by Ford to select employees for separation allowed unintentional stereotypes or prejudices about age to affect decisionmakers' selection of which employees would be separated.

84.     The foregoing mechanisms, means, criteria, and practices by which Ford implemented its organizational restructuring action/reduction-in-force made Plaintiff more vulnerable to separation because of age.

85.     These mechanisms, means, criteria, and practices were uniform and Company-wide, and thus the statistical disparities based on age must be determined based on a comparison between the jobs and persons selected for termination and the Company as a whole.

86.     Ford's use of these mechanisms, means, criteria, and practices did in fact result in disproportionate terminations of older employees, including Plaintiff, and therefore harmed older employees substantially more than younger employees.

**Ford intentionally discriminated against Plaintiff because of age.**

87.     When it implemented the organizational reduction action in April 2022, Ford knew that the practices used to select employees for separation would cause the selection of older employees for termination and would disproportionately harm older employees.

88.     In prior group terminations under the SIRP criteria, the practices by which Ford selects employees for separation have been proven, through statistical

evidence and otherwise, to discriminate against older employees by disproportionally selecting older employees for termination because of their age.

89.    For example, the 2019 SIRP terminations resulted in statistically significant disparities based on age, and Ford's highest-level executives and members of Ford's Board of Directors specifically requested that the termination program be used to "identify and elevate junior talent in the organization" and to pull up younger personnel from the Company's "pipeline" to replace the older employees who were selected for termination in the SIRP.

90.    Thus, when Ford terminated Plaintiff's employment, it knew that the practices used to select employees for termination would result in the disproportionate termination of older employees.

91.    When Ford implemented the alleged organizational restructuring action in April 2022, it had enough information to know that the practices used to select employees for termination would disproportionately select older employees for termination.

92.    Despite knowing that its actions would result in the targeting and disproportionate termination of older employees, Ford did not take any actions in 2022 to correct or lessen the impact that its methods would have on those employees, and thus knowingly and intentionally took actions that it knew would result in unlawful age discrimination in carrying out the 2022 separation program.

93.    In other words, Ford knew that its 2022 process would result in discrimination against older employees and implemented the 2022 process anyway, thus demonstrating that it intended for the process to result in discrimination against older employees in 2022.

94.    Ford took additional actions to ensure that older employees who were hired before January 1, 2004 and were approaching their ERISA Age and Service Milestones would be terminated without a fair opportunity to continue their careers with Ford, thus demonstrating the intent to discriminate because of age and for the purpose of preventing employees from achieving ERISA-protected Age and Service Milestones.

95.    In the process of implementing the group termination action, Ford also refused to consider or allow for salaried employees terminated in the SIRP, including Plaintiff, to transfer to open positions, or to relocate to maintain their employment, and it has refused to permit the targeted employees, including Plaintiff, from taking lower positions for which they were fully qualified and would have allowed them to continue their employment and reach their pension milestones.

96.    By contrast, Ford did not select for termination employees who were substantially younger than Plaintiff, and further is assigning, transferring, promoting, or hiring younger employees into positions to replace Plaintiff upon separation.

97.    In some instances, Ford retained and did not select for termination employees who were closer in age to Plaintiff, but who were not eligible for "55 and 10" or "30 and out" GRP benefits, or employees who had already reached their milestones, and could therefore be retained without accruing service credits towards the same defined pension benefits as Plaintiff would have, but-for their terminations.

98.    The SIRP termination program under which Ford terminated Plaintiff's employment was not a true and bona fide reduction-in-force because Ford has openly hired and posted for the hiring of new, substantially younger employees in positions that Plaintiff, based on their knowledge, experience, prior performance, and skill sets, were better qualified to perform.

99.    The legal standards and rules for analyzing employment decisions in the context of a reduction-in-force do not apply in this case because Ford did not engage in a bona fide reduction-in-force activity.

### Ford encouraged both conscious and unconscious age bias in the decision-making process.

100.   It is well-known that age stereotypes often infect a decision-making process, whether consciously or subconsciously, and that sometimes even well-intentioned decision makers unknowingly act on ageist biases, assumptions, or attitudes, as well as conscious or unconscious stereotypes about the performance, skills, abilities, or traits of older employees.

101.   Like all companies, Ford is affected by conscious age bias as well as implicit, or unconscious age bias.

102.   In this case, the policies and procedures used by Ford to carry out the restructuring action did not take into account the impact of age bias, either conscious or unconscious, which Ford knew would result in the disproportionate selection of older employees for termination.

103.   In fact, instead of discouraging the influence of conscious and unconscious age bias, Ford encouraged age bias in the process of selecting which employees would be selected for termination.

104.   For example, the messaging from Ford's leadership surrounding the need for organizational change, as well as how it would be achieved, directly fostered ageist stereotypes about older employees, including how when it comes to modernizing or adapting to new technologies, younger people have better and more valuable skills than older people.

105.   In March 2022, prior to Plaintiff's termination under the SIRP, Ford's CEO Jim Farley ("Farley") stated publicly that the Company would be making organizational changes and employee separations.

106.   In these statements, Farley used explicitly ageist as well as language which reveals an intention on the part of Ford to select older employees for separation based on their age.

26

107.   Farley expressly compared the state of the Company today to the state of the Company when his grandfather worked for Ford, saying, "My grandfather worked at the Rouge plant and those jobs are going to change."

108.   Farley also described needed organizational changes as requiring "totally different talent" because "We don't have that talent at Ford."

109.   Farley's comments reflect a bias against older incumbent employees based on the ageist assumptions that they are less useful than new talent, that they cannot develop new skills, cannot adapt their demonstrated skill sets to new requirements, and would be too slow in learning, developing or adapting skills to the needs of the Company.

110.   Farley's comments, and other messaging of a similar nature, signaled to decision-makers that it is okay to discriminate against older employees to serve Ford's overall objective of staying competitive in the evolving and modernizing automotive industry.

111.   Ford's organizational restructuring action/reduction-in-force, and the selection of Plaintiff for termination, is also rooted in ageist assumptions that older employees don't have enough value to the Company because their prior work involved internal combustion engines, and that they are not as valuable to the Company as it develops technology using digital features, new battery technology, and other electronics, and/or that Plaintiff and other older employees will likely

27

retire in the relative short-term and therefore will not provide sufficient future value to Ford.

112.   Ford's systemic bias against older employees is further reflected in the substance of the SIRP selection criteria, which were used to select which employees would be terminated.

113.   The three SIRP criteria are part of a uniform, centralized, and Company-wide program which directs and guides decision-making for salaried employee terminations, including Plaintiff's termination, and requires the use of common decision-making tools and criteria for selecting employees for separation.

114.   Each of the SIRP criteria, individually or combined, directs decision-makers to discriminate because of age.

115.   The "performance," "skills," and "correlation" / "skills for the future" criteria direct decision-makers to engage in undisciplined and purely subjective and biased decision-making about the quality of employees' performance, the nature and breadth of employees' skills, and what their future contribution to the Company might be, to the inherent disadvantage of older personnel.

116.   In addition, by requiring decision-makers to consider "skills for the future," the SIRP directs separation decisions on age-biased factors that are entirely subjective, including assumptions that younger employees will be more likely to have the skills needed for Ford's future objectives, and assumptions that older

employees will be less likely to adapt their skills to future needs, and that older employees will be slower to learn new skills, programs, and processes.

117.   The SIRP criteria also are not based on objective or quantitative metrics or criteria but are instead dependent on the highly subjective and discretionary impressions of decision-makers, and the implementation of the SIRP is therefore prone to discriminatory bias because it lacks structured, objective criteria to minimize the influence of conscious and unconscious age bias.

118.   As part of its subjective decision-making criteria, Ford utilizes a forced-ranking process known as the 25-panel process to formulate performance ratings, despite knowing that the 25-panel has been proven to be an age-biased method for rating employee performance.

### Ford's stated reasons for selecting
### Plaintiff for separation are a pretext for discrimination.

119.   The asserted reasons for Plaintiff's termination, including Ford's articulated reliance on one or more of the three SIRP criteria (performance, skills, and correlation) are merely a pretext for discrimination because Ford has relied upon the pretext of restructuring to replace Plaintiff with younger employees, or to clear a path for younger employees either to transfer, be hired for, or to move into positions for which Plaintiff was better qualified to perform.

120.   Furthermore, the articulated bases for selecting Plaintiff for termination (performance, skills/breadth of skills, and correlation) are demonstrably pretextual because if the SIRP criteria had been applied faithfully, rather than as a vehicle for age discrimination and interference with pension benefits, then Plaintiff would not have been terminated. This is because:

   a. Plaintiff was a long-term employee with a strong performance record, and there was therefore no factual basis for selecting him for termination based on prior performance.

   b. Plaintiff demonstrated the depth and breadth of skills needed to perform valuable jobs for the Company, thus demonstrating that there was no basis for terminating him under the "skills" criteria of the SIRP.

   c. Plaintiff demonstrated his ability to perform skills that correlated directly with the Company's business needs and, other than age-biased decision-making, there is no basis for concluding that Plaintiff lacked "skills for the future" in comparison with the substantially younger employees who were either retained or hired to fill positions that Plaintiff were better capable, through their skills and experiences, to perform.

121.   As a result of his termination from employment, Beckwith has suffered and will continue to suffer economic and non-economic damages including, but not limited to lost wages and benefits, lost pension benefits, lost retirement health care benefits, as well as mental anguish, embarrassment, and pain and suffering.

## COUNT I
### VIOLATION OF ERISA §510

122.   Beckwith incorporates by reference the allegations set forth above as if stated in full herein.

123.   Section 510 of ERISA, 29 U.S.C. §1140, makes it unlawful "[f]or any person to discharge, fine, suspend, expel, discipline or discriminate a participant or beneficiary... for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, [or] this title." 29 U.S.C. §1140.

124.   The prohibitions of § 510 are aimed primarily at preventing employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights.

125.   By its terms, § 510 protects plan participants from termination motivated by an employer's desire to prevent a pension from vesting. However, the protections of § 510 are not limited to vested pension rights. The Sixth Circuit has clarified that § 510 prohibits interference with rights to which an employee 'may

become entitled' under 'an employee benefit plan' and does not limit its application to benefits that will become vested.

126.   Unlawful interference under Section 510 includes terminating an employee in order to interfere with the employee's ability to receive future benefits under an ERISA plan. ERISA Section 510 is designed to protect the employment relationship which gives rise to an individual's pension rights.

127.   In this case, Ford intentionally terminated Plaintiff's employment pursuant to the SIRP for the specific purpose of interfering with his ability to receive identifiable ERISA Plan benefits, specifically (1) "55 and 10" early retirement benefits under the GRP; and (2) "30 and Out" supplemental benefits" under the GRP.

128.   In selecting employees for termination under the SIRP, Ford utilized a decision-making structure, computer program, database, and algorithm designed and implemented to target employees for termination based on proximity to age or service milestones.

129.   There is evidence that Ford was concerned about high GRP legacy costs attributable to older employees, such as Plaintiff, who was close to attaining full GRP benefits by achieving the "55 and 10" or 30-year retirement milestones.

130.   Both internally and publicly, Ford as expressed its concerns about increasing pension liabilities in the form of pension benefits that would be payable to aging employees, including Plaintiff, who were approaching but still short of their

"55 and 10" early retirement benefits and "30 and out" supplemental pension benefits.

131.   The highest members of Ford Senior management have expressed the intention and gave directives to terminate employees in the SIRP process if they were hired before January 1, 2004.

132.   Ford's intention to interfere with GRP benefits was a motivating factor in its decision to terminate Plaintiff's employment in the SIRP.

133.   Plaintiff was approaching vesting in full GRP benefits, and this proximity to vesting provides an inference of intentional, prohibited interference in violation of ERISA Section 510.

134.   Plaintiff has standing to bring this Section 510 claim against Ford because he is an employee or former employee of Ford who is or may become eligible to receive a benefit from the GRP, an employee benefit plan, and is therefore a "participant" in the GRP.

135.   Exhaustion of administrative remedies under the GRP is not required as a pre-condition to filing the ERISA claims in this action, as a matter of law, and because no such remedies are available to resolve any of the issues raised in this complaint and, if any such remedies were available, pursuing them would be futile.

136.   Neither Ford Motor Company nor the Plan Administrator of the GRP offers salaried employees such as Plaintiff an administrative appeal process to

challenge their "discharge…for the purpose of interfering with the attainment of" their GRP pension benefits, as prohibited by Section 510 of ERISA, 29 U.S.C. §1140.

137.   The lack of available administrative remedies is established by the fact that there are no provisions available by which Ford salaried employees such as Plaintiff can obtain a bridge to achieve their ERISA-protected age and service milestones, either by extending the timing of their termination, or by obtaining additional age or service credits to reach their milestone, or by purchasing additional time to qualify for GRP pension benefits.

138.   As a result of Ford's violation of Section 510 of ERISA, 29 U.S.C. §1140, Plaintiff has suffered and will continue to suffer damages in the form of lost salary and benefits, including GRP benefits.

139.   Accordingly, to redress the violations of ERISA §510 alleged in this action, Plaintiff requests the following relief from this Court:

    a.   A declaration that the GRP is an ERISA plan;

    b.   A declaration that Ford violated Plaintiff's rights under §510 of ERISA when it terminated Plaintiff's employment in order to interfere with his ability to receive future benefits under the GRP;

    c.   An equitable order of reinstatement to his prior position or to comparable positions of employment with Ford, or an equitable order of front pay in lieu of reinstatement;

    d.   An order of equitable relief awarding GRP benefits, or other monetary compensation, in order to make Plaintiff whole;

e. An order of any other equitable and/or legal relief the court deems necessary to enforce Plaintiff's rights under ERISA;

f. An award of attorneys' fees and costs.

## COUNT II
### VIOLATION OF THE FAMILY MEDICAL LEAVE ACT
### 29 U.S.C. § 2601 ET SEQ.

140. Plaintiff incorporates the foregoing paragraphs of this Complaint as though set forth fully herein.

141. At all times relevant to this action, Defendant Ford was an employer within the meaning of the FMLA because Defendant employed 50 or more employees.

142. At all times relevant to this action, Plaintiff was an eligible employee under the FMLA because he worked for at least 12 months for Defendant and in excess of 1,250 hours during the twelve months immediately preceding the date on which he took approved FMLA leave.

143. Under the FMLA, Beckwith was entitled to up to 12 weeks of leave because of his own serious health condition.

144. Plaintiff took approved FMLA leave in 2021 because of his stroke.

145. Defendant's Human Resources department approved Beckwith's request for leave because of his serious health condition.

146.   The Family Medical Leave Act, 29 U.S.C. §2615, creates a cause of action for persons denied protection of the Act because the employer either (1) interfered with, restrained, or denied the exercise of or the attempt to exercise, any right provided by the FMLA; or (2) discharged or in any other manner discriminated against any individual for opposing any practice made unlawful under the FMLA.

147.   Ford granted Plaintiff medical leave under the FMLA.

148.   Ford discriminated and retaliated against Beckwith for his use of FMLA leave by terminating his employment, and but-for Beckwith's use of FMLA leave, Ford would not have terminated his employment.

149.   Specifically, because Beckwith was on approved FMLA leave in 2021, and was not performing his work duties during his leave, it is reasonable to conclude that Ford relied upon his absence and lack of performance, either expressly or implicitly, in selecting him for separation under the alleged SIRP criteria, including: (1) the performance criteria, since his recent performance was affected by his time off work; (2) the skills criteria, since he was not able to utilize or demonstrate his skill set during time off work; and/or (3) the correlation criteria, since Beckwith's medical leave and corresponding medical conditions would create the perception that he would be less valuable to the Company in the future.

150.   As a result of Ford's actions, Beckwith was damaged by Defendant in the nature of lost wages, salary, employment benefits and other compensation, actual monetary losses and expenses incurred**.**

**COUNT III**
**VIOLATION OF ELCRA**
**AGE DISCRIMINATION- WRONGFUL TERMINATION**

151.   Beckwith incorporates by reference all the allegations contained above, as though stated in full herein.

152.   At all times relevant to this action, Defendant Ford was an employer within the meaning of the ELCRA.  MCL §37.2201(a).

153.    Under the ELCRA, Ford is prohibited from limiting, segregating, or classifying an employee in a way that deprives or tends to deprive the employee of an employment opportunity because of the individual's age, or to otherwise discriminate against an individual with respect to employment, compensation or a term, condition or privilege of employment, because of the individual's age.

154.   In violation of the statutory duties set forth in the ELCRA, Ford designed and implemented the SIRP for the purpose of targeting for termination older employees, including Beckwith, so that it could promote younger employees into positions held by older and more senior personnel.

155.   Beckwith was selected for termination as part of the SIRP because of age, as demonstrated in part by the fact that Ford retained significantly younger

employees in positions that Beckwith was qualified to perform, and Ford treated younger employees more favorably than Beckwith in the process of deciding which employees would be selected for separation.

156.   Specifically, while selecting Beckwith (age 53) for separation, Ford treated more favorably and did not select for separation significantly younger employees in the same classification as Beckwith, including two employees aged 46, one employee aged 44, and one employee aged 32.

157.   As a direct result of these unlawful employment practices, Beckwith has and will continue to experience economic losses in salary, incentive compensation and bonuses, fringe benefits, promotional opportunities and a loss of earning capacity caused by the stigma of being fired from a senior-level position with Ford.

158.   As a direct result of these unlawful employment practices, Beckwith has and will continue to experience non-economic losses including a loss of reputation, humiliation, embarrassment, mental anguish and emotional distress.

### COUNT IV
### VIOLATION OF ELCRA
### AGE DISCRIMINATION – DISPARATE IMPACT

159.   Plaintiff incorporates by reference all the allegations contained above.

160.   Ford's   implementation   of   the   organizational   restructuring action/reduction-in-force under the SIRP reduction-in force program and the use of

the mechanisms, means, processes and criteria to select which employees would be separated, while purportedly designed to be "neutral," violates the ELCRA's prohibition against age discrimination in that its application had a disparate impact on the Company's salaried employees age 50 and older who were considered for separation using the Company's SIRP selection criteria and the related methods, means, criteria, and processes for selecting which employees would be selected for separation.

161. The mechanisms, means, processes, and criteria used by Ford in the course of implementing the organizational restructuring action/reduction-in-force were the cause of the selection disparities based on age.

162. Plaintiff challenges the specific mechanisms, means, criteria, and practices by which Ford selected employees for termination in the course of implementing its organizational restructuring action/reduction-in-force, which caused significant statistical disparities based on age, including the following employment practices:

> a. Designing and programming its reduction-in-force/organizational restructuring process to target older and higher pension-cost salaried employees based on legally protected characteristics including the employee's proximity to retirement benefit milestones or the employee's age.

b. Targeting demographically disproportionate departments for separations, thus increasing the likelihood of selecting employees over the age of 50.

c. Defendant's use of the stated SIRP criteria, including: " the employee's performance; the employee's skill level and breadth of skills; and the correlation between the employee's skill level and breadth of skill and the work that is necessary for the Company to perform to achieve its objectives."

d. Defendant's practice of allowing decision makers to make putatively individualized, discretionary and subjective choices of which jobs to eliminate and/or which employees to select for separation.

e. Placing the decision-making process in the hands of multiple decision makers without uniform criteria or standardized guidance when making those decisions.

163.   Traditionally, Ford has used forced ranking performance evaluation processes and other ranking and rating methods that are biased against its older employees, and, upon information and belief, Ford used those same or similar forced ranking and other ranking and rating methods in the course of implementing the 2022 SIRP reduction-in-force.

164.   These particular employment practices by which Ford carried out its reduction-in-force had a disparate impact based on age in violation of ELCRA.

165.   The age disparity caused by the practices used by Ford to implement the organizational restructuring action/reduction-in-force cannot be justified as necessary to Ford's business.

166.   Regardless of Ford's stated reasons for implementing the organizational restructuring/reduction-in-force (cost savings, modernizing or refining the workforce, or other), the practices by which Ford carried out the RIF, which Plaintiff challenges in this case, are not themselves defensible as a business necessity, in part because Ford could have achieved its overall objectives without utilizing the practices which caused an unlawful disparity based on age.

167.   As a direct result of the disparate impact because of age, Plaintiff has suffered an adverse employment action, in the form of their contemporaneous terminations from employment, and will continue to suffer, all of the injuries and damages as set forth above.

168.   Accordingly, Plaintiff requests the following relief from this Court:

a.   An order of this Court declaring that the SIRP reduction-in-force program utilized by Ford to select individuals for layoff violates the ELCRA and enjoining the further application of those policies and practices;

b.   An order of this Court awarding Plaintiff all economic losses, lost wages and benefits, and other forms of compensation, economic

and non-economic damages, past and future, resulting from the discriminatory treatment described in this Complaint;

c. An order of this Court reinstating Plaintiff to employment with Ford in positions comparable to the position he held at the time he was terminated;

d. An order of this Court awarding interest, costs and attorney fees; and

e. An order of this Court awarding such other relief as this Court deems just and equitable.

## COUNT V
## VIOLATION OF PDCRA
## DISABILITY DISCRIMINATION

169. Beckwith incorporates by reference the allegations set forth above as if stated in full herein.

170. At all relevant times, Beckwith was an employee and Defendant was an employer within the meaning of Michigan's Persons with Disabilities Civil Rights Act, M.C.L. §37.1101, *et seq* (the PDCRA).

171. The PDCRA makes it unlawful for an employer to discriminate against a qualified individual because the individual has a disability, a record of a disability, or because the employer regards the individual as disabled.

172. At all times relevant to this action, Beckwith was a qualified individual with a disability pursuant to the PDCRA who, with or without accommodation, could perform the essential functions of his position.

173.   Beckwith was an individual with a disability within the meaning of the PDCRA, in that he had a physical impairment that substantially limited one or more of his major life activities, who with or without accommodation could perform the essential functions of his job with Defendant and/or Beckwith had a record of such a disability and/or was regarded by Defendant as having such a disability.

174. Notwithstanding said duties as set forth above, Defendant discriminated against Beckwith because of his disability, specifically his stroke and stroke-related conditions, including aphasia and apraxia, and/or because it regarded Beckwith as disabled and/or because Beckwith had a history of a disability when it terminated his employment and designated him as ineligible for re-hire.

Accordingly, Beckwith requests the following relief:

a.   The court should order him reinstated to his prior position, or award front pay in lieu of reinstatement.

b.   The court should award Beckwith compensation for his economic and non-economic losses.

c.   The court should award Beckwith actual attorney fees and litigation costs as provided for in the PDCRA.

d.   The court should award Beckwith such other relief as the court determines to be fair and just.

## COUNT VI
## VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT
### (Disability Discrimination, Failure to Accommodate, and Retaliation)

175.   Plaintiff incorporates the foregoing allegations by reference as though stated in full herein.

176.   At all times relevant hereto, Plaintiff was an employee and Defendant was an employer under the ADA. 42 U.S.C. § 12111.

### Disability Discrimination

177.   The ADA makes it unlawful for an employer to discriminate against a qualified individual because the individual has a disability, a record of a disability, or because the employer regards the individual as disabled.

178.   At all times relevant to this action, Plaintiff was a qualified individual with a disability pursuant to 42 U.S.C. §12111(8) who, with or without accommodation, could perform the essential functions of his position.

179.   Plaintiff was an individual with a disability within the meaning of 42 U.S.C. §12102, in that he had a physical impairment that substantially limits one or more of his major life activities, specifically his stroke and stroke-related conditions, including aphasia and apraxia,  who with or without accommodation could perform the essential functions of his job with Defendant, and/or Plaintiff had a record of such a disability, and/or was regarded by Defendant as having such a disability.

180. Notwithstanding said duties as set forth above, Defendant discriminated against Plaintiff because of his disability and/or because it regarded Plaintiff as disabled and/or because Plaintiff had a history of a disability when it terminated Plaintiff's employment.

### Failure to Accommodate

181. The ADA further requires employers to engage in a meaningful interactive process with employees with regard to reasonable accommodations.

182. Failure to engage in a meaningful interactive process upon notice that an employee may require accommodation is a violation of the ADA.

183. Prior to Plaintiff's termination, Defendant was aware that Plaintiff may require accommodation because of his actual or record of disability but failed to engage in a meaningful interactive process with Plaintiff to provide him with a reasonable accommodation.

184. At all times relevant hereto, Defendant had a duty under the ADA to accommodate Plaintiff for purposes of employment unless the accommodation would impose undue hardship. Defendant's duty to accommodate Plaintiff includes, but is not limited to, providing Plaintiff with medical leave.

185. At all times relevant hereto, Defendant could have accommodated Plaintiff's disability without suffering an undue hardship.

186.   Rather than engage in a meaningful interactive process with Plaintiff or otherwise provide him with a reasonable accommodation, Defendant terminated Plaintiff's employment.

## Retaliation

187.   At all times relevant hereto, Defendant had a duty not to retaliate against Plaintiff with respect to his employment, compensation or terms, conditions or privileges of employment, or to limit, segregate, or classify Plaintiff for employment in any way which deprived or tended to deprive Plaintiff of employment opportunities or otherwise adversely affect the employment status of Plaintiff, in retaliation for him requesting or needing accommodation.

188.   Notwithstanding said duties as set forth above, Defendant retaliated against Plaintiff for requesting or needing accommodation when it terminated his employment.

189.   As a direct and approximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer lost wages, and other economic advantages of employment; Plaintiff has and will continue to suffer mental anguish, humiliation, embarrassment, and emotional distress, loss of status in his chosen profession, and pain and suffering resulting from the discriminatory and retaliatory conduct of the Defendant.

Accordingly, Plaintiff requests the following relief:

a. An order reinstating Plaintiff to his former position or a comparable position.

b. An order awarding Plaintiff compensation in an amount he is found to be entitled to.

c. An order awarding Plaintiff liquidated damages as provided for under the ADA.

d. An order awarding Plaintiff interest, costs, attorney fees and litigation expenses as provided for under the ADA.

e. An order granting Plaintiff such other relief as the court deems just and equitable.

Respectfully submitted,

Pitt, McGehee, Palmer,
Bonanni & Rivers PC

By: */s/ Channing E. Robinson-Holmes*
Channing E. Robinson-Holmes (P81698)
Kevin M. Carlson (P67704)
Michael L. Pitt (P24429)
Attorneys for Plaintiff
117 West Fourth Street, Suite 200
Royal Oak, Michigan 48067
(248) 398-9800 (phone)
(248) 268-7996 (fax)
kcarlson@pittlawpc.com
mpitt@pittlawpc.com
crobinson@pittlawpc.com

Date: April 21, 2023

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

RODNEY BECKWITH IV,

       Plaintiff,

vs.

FORD MOTOR COMPANY, a
Delaware Corporation

       Defendant.

Case No. 22-cv-12641
Hon. F. Kay Behm
Mag. Judge Elizabeth A. Stafford

| | |
|---|---|
| PITT, MCGEHEE, PALMER, BONANNI & RIVERS P.C.<br>Channing E. Robinson-Holmes (P81698)<br>Kevin M. Carlson (P67704)<br>Michael L. Pitt (P24429)<br>Attorneys for Plaintiff<br>117 W. Fourth Street, Suite 200<br>Royal Oak, Michigan 48067<br>(248) 398-9800<br>(248) 268-7996 (fax)<br>kcarlson@pittlawpc.com<br>mpitt@pittlawpc.com<br>crobinson@pittlawpc.com | Katherine V.A. Smith (247866)<br>Jesenka Mrdjenovic (P82587)<br>Gibson Dunn & Crutcher LLP<br>Attorneys for Defendant<br>333 South Grand Avenue<br>Los Angeles, CA 90071<br>Telephone: 213.229.7000<br>Facsimile: 213.229.7520<br>KSmith@gibsondunn.com<br>JMrdjenovic@gibsondunn.com |

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury as to all issues raised in this action.

Respectfully submitted,

Pitt, McGehee, Palmer,
Bonanni & Rivers PC

By: /s/ Channing E. Robinson-Holmes

49

Channing E. Robinson-Holmes (P81698)
Kevin M. Carlson (P67704)
Michael L. Pitt (P24429)
Attorneys for Plaintiff
117 West Fourth Street, Suite 200
Royal Oak, Michigan 48067
(248) 398-9800 (phone)
(248) 268-7996 (fax)
kcarlson@pittlawpc.com
mpitt@pittlawpc.com
crobinson@pittlawpc.com

Dated: April 21, 2023